No. 23-12584

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELAINE HARRELL,

*Plaintiff-Appellant*

v.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., *et al.*,

*Defendants-Appellees*

IN RE: ZANTAC (RANITIDINE) PRODUCTS LIABILITY LITIGATION

On Appeal from the United States District Court
for the Southern District of Florida
MDL No. 2924

## APPELLANT HARRELL'S OPENING BRIEF

April 10, 2024

Ashley Keller
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Tel: (312) 741-5222
ack@kellerpostman.com

Noah Heinz
KELLER POSTMAN LLC
1101 Connecticut Ave., NW
Suite 1100
Washington, DC 20036
noah.heinz@kellerpostman.com

*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF INTERESTED PERSONS**

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Plaintiff-Appellant

hereby certifies that the previously filed certificate remains correct.


Dated:   April 10, 2024        Respectfully submitted,

/s/ *Ashley Keller*
Ashley Keller
KELLER POSTMAN LLC
150 N. Riverside Plaza, Suite 4100
Chicago, IL  60606
Tel: (312) 741-5220

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument because this appeal presents a question of first impression in an important area of federal jurisdiction.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................................C-1

Statement Regarding Oral Argument ......................................................................... i

Table of Contents ...................................................................................................... ii

Table of Authorities ................................................................................................. iv

Statement of Jurisdiction......................................................................................... viii

Introduction ...............................................................................................................1

Statement of the Issue ...............................................................................................2

Statement of the Case................................................................................................2

    A.    Factual Background............................................................................3

    B.    Procedural History.............................................................................8

    C.    Fraudulent Joinder Legal Standard ..................................................10

Standard of Review..................................................................................................13

Summary of Argument.............................................................................................13

Argument..................................................................................................................14

I.      The Missouri Innocent Seller Statute Provides A Limited Defense To Strict Liability Claims. ...................................................................................14

II.     The Missouri Innocent Seller Statute Does Not Apply To Ms. Harrell's Negligence Claim. .........................................................................................16

A.    The Negligence and Unjust Enrichment Claims Are Not Product Liability Claims. ................................................................17

B.    Ms. Harrell's Claims Are Not Based Solely on Schnucks' Status as a Seller. ...............................................................................18

C.    The District Court's Contrary Holding Was Flawed. .........................21

III.    Defendants Failed To Prove Schnucks Was Immune. ...................................24

Conclusion ............................................................................................27

Certificate of Compliance ........................................................................28

Certificate of Service ..............................................................................29

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Anderson v. R.J. Reynolds Tobacco Co.*,

    549 F. Supp. 3d 979 (E.D. Mo. 2021)...................................................................25

*Batoff v. State Farm Ins. Co.*,

    977 F.2d 848 (3d Cir. 1992)............................................................................11

*Bell v. Hood*,

    327 U.S. 678 (1946)............................................................................... 10, 11

*Bizzle v. McKesson Corp.*,

    961 F.2d 719 (8th Cir. 1992) ...........................................................................18

*Crowe v. Coleman*,

    113 F.3d 1536 (11th Cir. 1997) .......................................................................12

*Davis v. Dunham's Athleisure Corp.*,

    362 F. Supp. 3d 651 (E.D. Mo. 2019) ...............................................................25

\*   *Gramex Corp. v. Green Supply, Inc.*,

    89 S.W.3d 432 (Mo. 2002) ...................................................................... 22, 24

iv

*Grancare, LLC v. Thrower*,

    889 F.3d 543 (9th Cir. 2018) ...............................................................10

\*  *Henderson v. Wash. Nat'l Ins. Co.*,

    454 F.3d 1278 (11th Cir. 2006) ................................................. 11, 21

*Just. v. Rural King Holdings, LLP*,

    No. 4:22-cv-00050, 2022 WL 2904141 (E.D. Mo. July 22, 2022) ....................25

*Malone v. Schapun, Inc.*,

    965 S.W.2d 177 (Mo. Ct. App. 1997)...................................................18

*Shamrock Oil & Gas Corp. v. Sheets*,

    313 U.S. 100 (1941) ........................................................................ 1, 12

*Steel Co. v. Citizens for a Better Env't*,

    523 U.S. 83 (1998) ............................................................................10

\*  *Stillwell v. Allstate Ins. Co.*,

    663 F.3d 1329 (11th Cir. 2011) ............................................... *passim*

*Strawbridge v. Curtiss*,

    7 U.S. (3 Cranch) 267 (1806)...............................................................1

*Thomas v. Brown & Williamson Tobacco Corp.*,

    No. 06-cv-0223, 2006 WL 1194873 (W.D. Mo. Apr. 28, 2006)........................25

*Thompson v. R.J. Reynolds Tobacco Co.*,

    4:20-cv-980, 2020 WL 5594072 (E.D. Mo. Sept. 18, 2020)..............................25

*Thornton v. M7 Aerospace LP*,

    796 F.3d 757 (7th Cir. 2015) ...............................................................................10

*Triggs v. John Crump Toyota, Inc.*,

    154 F.3d 1284 (11th Cir. 1998) .........................................................................12

*Ullah v. BAC Home Loans Servicing LP*,

    538 F. App'x 844 (11th Cir. 2013) ........................................................ 11, 12, 21

*United States v. Dotterweich*,

    320 U.S. 277 (1943)............................................................................................23

∗ *Univ. of S. Ala. v. Am. Tobacco Co.*,

    168 F.3d 405 (11th Cir. 1999) ...................................................................... 1, 12

*Wichmann v. Proctor & Gamble Manufacturing Company*,

    No. 4:06-cv-1457, 2006 WL 3626904 (E.D. Mo. Dec. 11, 2006)............... 24, 26

*Wyeth v. Levine,*

   555 U.S. 555 (2009) .........................................................................22

**Statutes**

21 U.S.C. § 331 ...............................................................................23

21 U.S.C. § 333 ...............................................................................23

21 U.S.C. § 334 ...............................................................................23

21 U.S.C. § 352 ...............................................................................23

28 U.S.C. §1291 ............................................................................. vii

* 28 U.S.C. §1332 ....................................................................... vii, 1

28 U.S.C. § 1441 ...............................................................................1

28 U.S.C. § 1447 ...............................................................................1

Mo. Ann. Stat. § 537.760 ...............................................................17

Mo. Ann. Stat. § 537.762 ......................................................... 15, 18

**Regulations**

21 C.F.R. § 314.170 .........................................................................23

## STATEMENT OF JURISDICTION

This Court has appellate jurisdiction under 28 U.S.C. §1291 because the district court entered final judgment. Federal subject matter jurisdiction in the district court was not proper under 28 U.S.C. §1332, both because both Ms. Harrell and Schnuck Markets, Inc. are citizens of Missouri, and because the district court destroyed complete diversity by merging the cases.

**INTRODUCTION**

This case belongs in Missouri state court—where it was initially filed—because Appellant Elaine Harrell and Defendant Schnucks Market, Inc. (Schnucks) are both Missouri residents. The Supreme Court has required complete diversity between the parties for more than two hundred years. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 267 (1806). The federal statute conferring diversity jurisdiction requires plaintiffs and defendants to be "citizens of different States," 28 U.S.C. § 1332(a)(1), and the statute conferring removal jurisdiction bars removal if diversity is lacking. 28 U.S.C. § 1441. If diversity jurisdiction is absent, "the case shall be remanded." 28 U.S.C. § 1447(c). If it is *unclear* whether diversity jurisdiction exists, a court should remand: "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (citation omitted).

Though the plain text of these statutory provisions is clear, federal courts have grafted on a narrow, sharply limited, atextual exception called "fraudulent joinder." The standard for fraudulent joinder is extreme. "[F]ederal courts are directed to construe removal statutes strictly" and "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168

F.3d 405, 411 (11th Cir. 1999). Defendants bear a heavy burden to show by "clear and convincing evidence" that "there is no possibility the plaintiff can establish a cause of action against the resident defendant." *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011) (citation omitted).

Defendants did not satisfy that burden here. They argued—with no evidentiary support—that Ms. Harrell's claim against Schnucks would fail under Missouri's innocent seller law. But that law does not apply to negligence claims, which Ms. Harrell alleged. And it requires Defendants to *prove* Ms. Harrell could recover from the other Defendants, which they entirely failed to do. The district court's contrary ruling was erroneous and impinges upon the Missouri courts' prerogative to decide controversies between citizens of that state. The judgment should be vacated, with instructions to remand the case to Missouri state court.

## STATEMENT OF THE ISSUE

1. Did the district court lack diversity jurisdiction because the operative pleading included plaintiffs and defendants from the same states?

## STATEMENT OF THE CASE

Appellant Elaine Harrell is a resident of St. Louis, Missouri. *Harrell*.Dkt.3 ¶13 (petition).[1] In 1992—when she was already living in St. Louis—Ms. Harrell began buying and consuming Zantac, both in prescription form and over-the-

---

[1] This brief refers to docket entries in this Court as "Dkt.," the individual docket below as "*Harrell*.Dkt.," and those in the MDL docket below as "MDL.Dkt."

counter. *Id.* ¶14. Ms. Harrell bought her Zantac from Schnucks, a large St. Louis-based supermarket chain with a pharmacy. *Id.* ¶¶15, 165. She bought and consumed Zantac from 1992 through 2019, when, tragically, she was diagnosed with kidney cancer. *Id.* ¶¶14-16. Ms. Harrell did not know that Zantac degrades into NDMA, a potent carcinogen that caused her kidney cancer. *Id.* ¶¶15-19. She filed suit against Schnucks, as well as various brand-name manufacturers of Zantac in the Circuit Court of the Twenty-Second Judicial Circuit in St. Louis Missouri. *Id.* ¶1.

### A. Factual Background

Ranitidine is an antacid developed by a predecessor company to GlaxoSmithKline in the 1980s and marketed under the brand-name "Zantac." *Id.* ¶¶44-48. Zantac is one of the most profitable drugs of all time. *Id.* ¶48. In 2019 and 2020, two citizen petitions alerted the Food and Drug Administration to the dangerous levels of NDMA in ranitidine. *Id.* ¶¶94, 101. The FDA immediately required testing, which confirmed that NDMA levels of ranitidine were far beyond the limits allowed by the FDA, prompting a nationwide recall of the drug "to protect the public health." *Id.* ¶¶94-104 (quotation marks omitted). Every other country pulled Zantac from their markets as well. *Id.* ¶105.

Though the public was surprised, red flags about the danger of "nitrosation" in ranitidine—that is, degradation of ranitidine into a "nitrosamine"—date back to the 1980s. *Id.* ¶100. NDMA is a kind of nitrosamine and is widely recognized to

cause cancer. *Id.* ¶¶73-93 ("Its only use today is to cause cancer in laboratory animals."). In 1983, researchers published a study titled "*Genotoxicity of Nitrosated Ranitidine*" that warned that "[t]he molecules of . . . ranitidine carry nitrosatable sites," which "lead to the formation of genotoxic and/or carcinogenic derivatives." De Flora et al., *Genotoxicity of Nitrosated Ranitidine*, 4 Carcinogenesis 3, 255–60 (1983) (cited in the complaint at *Harrell*.Dkt.3 ¶125 n.53). Other researchers flagged the same risk, warning that "reaction of ranitidine with excess sodium nitrite under acid conditions gives rise to a nitrosoderivative (or derivatives) capable of inducing DNA damage in mammalian cells," a well-established precursor for cancer. Maura et al., *DNA Damage Induced by Nitrosated Ranitidine in Cultured Mammalian Cells*, 18 Tox. Lttrs. 97-102 (1983) (cited in the complaint at *Harrell.Dkt.*3 ¶124 n.52). Maura and his co-authors recommended that sellers "assess whether or not N-nitroso compounds are formed, even in very small amounts, in patients taking ranitidine." *Id.* No seller did so.

In 2003, scientists at Yale and other universities investigated why so much water was contaminated with NDMA. Mitch et al., *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 Env. Eng. Sci. 5, 389–404 (2003) (cited in the complaint at *Harrell.Dkt.*3 ¶110 n.40). A primary explanation was that "industrial products [] could be precursors for NDMA formation," and one of the primary suspects they identified was "ranitidine," *i.e.*,

Zantac. *Id.* They believed that Zantac contaminates water supplies with NDMA based on basic chemistry: ranitidine has a "dimethylamine functional group[]" that could "be a precursor" for NDMA. *Id.* at 396. Since ranitidine is routinely discarded in toilets, and excreted in urine, they reasoned, and since ranitidine readily degrades into NDMA, Zantac might be a primary reason why the world's water supplies contained so much NDMA.

Scientists published similar results in 2012, in a paper entitled "*NDMA Formation by Chloramination of Ranitidine.*" Le Roux et al., *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 Env't Sci. Tech. 20, 11095–103 (2012) (cited in the complaint at *Harrell.Dkt.*3 ¶126 n.54). The Le Roux paper described ranitidine as "a major precursor of NDMA" and stated that ranitidine "has been demonstrated to produce high yields of NDMA." The researchers noted that ranitidine "has been detected in . . . wastewaters" across the world and "could explain the important NDMA formation potentials of wastewaters." *Id.* at 11095. They included a picture showing the ranitidine molecule degrading into NDMA:



As the complaint alleges, "[t]hese studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA" by a variety of different pathways including in test-tubes, in water, and "in the human body." *Harrell*.Dkt.3 ¶¶126-27. Amazingly, despite this ample evidence that ranitidine *did* break down into NDMA under a wide variety of conditions, no company tested the pill directly to detect *how much* NDMA the typical ranitidine pill degraded into. The answer ended up being a dangerous amount. The amount of NDMA in ranitidine varies substantially, mostly based on how much heat and humidity it is exposed to, and over what period of time. *Id.* ¶149.

Schnucks Market, Inc. ("Schnucks") was far from a mere seller of Zantac. It had "90 . . . in-store, full-service pharmacies" and "at least nine specialty pharmacy locations," which bragged about providing a "unique and personalized approach in helping its customers "manage complex medical conditions" using "dedicated resources and personnel available to provide high touch knowledgeable specialty pharmacy care." *Id.* ¶165-66 (quotation marks omitted). When Ms. Harrell was purchasing Zantac from Schnucks, it had "extensive pharmacy and health care operations" and "employed both a Chief Medical Officer and a Vice President of Pharmacy." *Id.* ¶167. It positioned itself "as a resource of health and wellness information." *Id.* ¶169. "Schnucks offers non-pharmacy health programs and services to consumers, holding itself out as a knowledgeable and trusted health

resource for its consumers. For example, Schnucks offered a 'Comprehensive Diabetes Education Program' that included, among other things, 'Ten hours of hands-on training by . . . qualified pharmacists,' diet and nutritional information, and educational classes on topics such as Gestational Diabetes and Insulin use, as well as access to 'diabetes specialists' at its locations." *Id.* ¶170 (ellipsis in original).

Beyond its expertise, "Schnucks promoted, advertised, and sold to the public, including Plaintiff, Zantac, through the use of . . . advertisements and promotions created and developed . . . [by] Schnucks." *Id.* ¶69. The Zantac it sold "exposed consumers to NDMA." *Id.* ¶68. It "knew or should have known, and had available to it information demonstrating that Zantac exposes the consumer to unsafe levels of NDMA, and that NDMA causes cancer." *Id.* ¶11; *see also* ¶163 ("was aware" of the risk); ¶174-78 (regarding knowledge).

Schnucks recalled its ranitidine in 2019. *Id.* ¶94. It should have acted with reasonable care earlier. Schnucks "knew or . . . should have known" about "the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored," and that ranitidine is "highly unstable" and "likely to break down." *Id.* ¶¶321-23. Schnucks violated its duty of reasonable care in "handling, distribution, storage," and "deliberately refused to test ranitidine-containing products for NDMA levels because they knew that the chemical posed serious health risks to humans." *Id.* ¶326. Schnucks was negligent in its "handling, distribution,

[and] storage," and "fail[ed] to … handle, distribute, [and] store" ranitidine so that it was "safe." *Id.* ¶331.  All "Defendants knew that ranitidine-containing products posed a grave risk of harm but failed to warn of the dangerous risks associated with use and exposure to the products.  The dangerous propensities of their products and the carcinogenic characteristics of NDMA were well known to Defendants." *Id.* ¶384.

## B.  Procedural History

After Ms. Harrell filed her petition in her home state of Missouri, Defendants removed it to federal court in Missouri and sought transfer to the Zantac MDL. *Harrell*.Dkt.1.  The notice asserted that Schnucks was fraudulently joined, principally arguing that she was bound to follow the MDL court's rulings because she participated in a tolling agreement by joining a claims registry, and that filing in Missouri constituted "efforts to violate the MDL Court's orders," chiefly those dismissing claims against retailers. *Id.* ¶¶21-48.  This argument was absurd, since the MDL court's orders do not apply to *unfiled cases*.

Ms. Harrell moved to remand, *Harrell*.Dkt.19, but the district court stayed the case, *Harrell*.Dkt.35.  The Judicial Panel on Multidistrict Litigation transferred it to the Zantac MDL, *Harrell*.Dkt.36-40, where Ms. Harrell renewed her motion to remand, MDL.Dkt.4739, 4924.  Once the case was transferred to the MDL, Defendants abandoned their principal argument. *See generally* MDL.Dkt.5057 (not

mentioning "tolling" or "registry" even once). Rather, they argued the claims are preempted by federal law—an argument that has failed to support fraudulent joinder in *dozens* of cases, including a large volume of Zantac cases. *Id.* at 4-6. And they argued breezily that the Missouri innocent seller statute applies. *Id.* at 6-7. Defendants cited not one paragraph of the complaint in their innocent seller argument, relying entirely on their own characterization of the complaint. *Id.*

The district court denied the motion to remand. MDL.Dkt.5166. It rejected Defendants' preemption arguments (again). *Id.* at 3-4. But it accepted the innocent seller argument, focusing on arguments Defendants did not make. Even though the Missouri innocent seller statute contemplates an *evidentiary* motion—and Defendants included no evidence whatsoever—the district court presumed that the removing defendants would fully satisfy any claim and had proved they *were* in fact the manufacturers. *Id.* at 5. The district court next straw-manned Ms. Harrell's argument for her negligence claim as the notion that "Schnuck is alleged to be the functional equivalent of a manufacturing Defendant that designed ranitidine," *id.*, then rejected that notion as implausible, *id.* at 5-9. In the district court's view, the complaint alleged only that "Schnuck employed a chief medical officer," and that all Defendants "engaged in many different acts." *Id.* at 6. After limiting the complaint to these facts, it rejected both, holding that the Missouri fact-pleading standard is *stricter* than the federal standard, and—in an argument never argued by

the Defendants—that Schnucks' knowledge of ranitidine's dangers was implausible because "the FDA continued to approve ranitidine for sale" and Schnucks "could rely upon the FDA's approval of ranitidine." *Id.* at 7.

When, much later, the district court entered final judgment in her case, Ms. Harrell filed a timely notice of appeal. MDL.Dkt.6893.

## C. Fraudulent Joinder Legal Standard

Fraudulent joinder is an atextual exception to the complete diversity rule that this Court applies sparingly. The exception follows the same principles as the exception from federal question jurisdiction described in *Bell v. Hood*, 327 U.S. 678 (1946). Just as the failure of a claim *on the merits* does not warrant a jurisdictional dismissal, the failure of a claim on the merits does not warrant a finding of fraudulent joinder. For federal questions, jurisdiction exists "unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell*, 327 U.S. at 682-83). "The standard for fraudulent joinder is similarly demanding." *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 765 (7th Cir. 2015) (citing *Steel Co.*); *accord Grancare, LLC v. Thrower*, 889 F.3d 543, 549 (9th Cir. 2018) ("the standard [for fraudulent joinder] is similar to the 'wholly insubstantial and frivolous' standard for dismissing claims under Rule

12(b)(1) for lack of federal question jurisdiction") (quoting *Bell*, 327 U.S. at 682-83); *Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 852 (3d Cir. 1992) (same).

This Court's precedents have underscored the difficulty of demonstrating fraudulent joinder. Defendants bear a heavy burden: to show by "clear and convincing evidence" that "there is no possibility the plaintiff can establish a cause of action against the resident defendant." *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011) (citation omitted). "The standard for evaluating whether the plaintiff can establish a cause of action against the resident defendant is very lenient." *Ullah v. BAC Home Loans Servicing LP*, 538 F. App'x 844, 846 (11th Cir. 2013).

When a Defendant proffers no evidence, the court must examine the pleading alone, and in that inquiry "[n]othing in our precedents concerning fraudulent joinder requires anything more than conclusory allegations or a certain level of factual specificity." *Stillwell*, 663 F.3d at 1334. That is true even where the state pleading standard requires specificity, since the Court's "task is not to gauge the sufficiency of the pleadings" but rather is "more basic," namely to "decide whether the defendants have proven by clear and convincing evidence that no [state] court could find this complaint sufficient." *Henderson v. Wash. Nat'l Ins. Co.*, 454 F.3d 1278, 1284 (11th Cir. 2006). In applying this standard, the Court should also consider

whether the state court would "allow the plaintiff to amend the complaint and provide a more definite statement." *Ullah*, 538 F. App'x at 846.

Suspicion of a plaintiff's desire to join an in-state defendant in order to file in state court is not a ground for finding fraudulent joinder. Rather, "Supreme Court precedent is clear that a plaintiff's motivation for joining a defendant is not important." *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1291 (11th Cir. 1998). Instead, "federal courts are directed to construe removal statutes strictly" and "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999). That extends to resolving any "uncertainties" of law or fact in favor of remand. *Stillwell*, 663 F.3d at 1333; *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (same).

All of these strictures on extending federal jurisdiction beyond the text of section 1332 promote federalism. "A presumption in favor of remand is necessary because if a federal court reaches the merits of a pending motion in a removed case where subject matter jurisdiction may be lacking it deprives a state court of its right under the Constitution to resolve controversies in its own courts." *Am. Tobacco Co.*, 168 F.3d at 411. Remanding cases to state court is part and parcel of "[d]ue regard for the rightful independence of state governments." *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (citation omitted).

## STANDARD OF REVIEW

This Court reviews denials of motions to remand based on fraudulent joinder *de novo*.  *Stillwell*, 663 F.3d at 1332.

## SUMMARY OF ARGUMENT

The judgment below should be vacated, and this case remanded to Missouri state court.  The district court found complete diversity by disregarding Schnucks because, in the district court's view, the Missouri innocent seller law barred claims against it.  That holding misapplies Missouri law.  The Missouri innocent seller law provides a limited defense against product liability claims based solely on a defendant's status as a seller.  To earn the protection of that affirmative defense, a defendant must submit evidence showing that the products liability claim is based solely on its status as a seller, that the manufacturer defendant is a party, and that the manufacturer defendant can fully pay any ultimate recovery.

The Missouri innocent seller law does not apply to Ms. Harrell's negligence and unjust enrichment claims.  The innocent seller law by its text applies only to products liability claims, which are defined in Missouri law as strict liability claims.  Thus, the defense does not apply to the negligence and unjust enrichment claims.  The claims in this case are also not based solely on Schnucks' status as a seller, because the complaint alleges that it knew that ranitidine can degrade into NDMA.  The complaint further alleges that its independent negligence caused more NDMA to build up in the ranitidine it sold.  The district court's disagreement on these points

is based on misconstruing the pleading standard for fraudulent joinder cases, and inferring (without any basis) that ranitidine was safe while Schnucks sold it because the FDA had not yet removed it from the market.

Even if the innocent seller statute could cover to Ms. Harrell's claims, Defendants did not satisfy their burden of proof. They submitted no evidence that Schnucks' liability is solely as a seller, no evidence (or admission) that the Defendants in the case are the manufacturers of the ranitidine that harmed Ms. Harrell, and no evidence that the Defendants in the case can fully pay her recovery. Missouri courts commonly deny the innocent seller defense when a defendant fails to proffer evidence. Defendants thus failed to carry their burden under not only Missouri law, but also the federal fraudulent joinder standard as well. The case should be remanded.

## ARGUMENT

The district court erred in applying the Missouri innocent seller law here for two independent reasons. First, the statute by its own terms does not apply to negligence claims. And, second, the statute requires Defendants to make certain evidentiary showings that they wholly failed to demonstrate in this case.

## I. The Missouri Innocent Seller Statute Provides A Limited Defense To Strict Liability Claims.

This Court must start with the text of the Missouri statute, which provides as follows:

1. A defendant whose liability is based solely on his status as a seller in the stream of commerce may be dismissed from a products liability claim as provided in this section.

2. This section shall apply to any products liability claim in which another defendant, including the manufacturer, is properly before the court and from whom total recovery may be had for plaintiff's claim.

3. A defendant may move for dismissal under this section within the time for filing an answer or other responsive pleading unless permitted by the court at a later time for good cause shown. The motion shall be accompanied by an affidavit which shall be made under oath and shall state that the defendant is aware of no facts or circumstances upon which a verdict might be reached against him, other than his status as a seller in the stream of commerce.

4. The parties shall have sixty days in which to conduct discovery on the issues raised in the motion and affidavit. The court for good cause shown, may extend the time for discovery, and may enter a protective order pursuant to the rules of civil procedure regarding the scope of discovery on other issues.

5. Any party may move for a hearing on a motion to dismiss under this section. If the requirements of subsections 2 and 3 of this section are met, and no party comes forward at such a hearing with evidence of facts which would render the defendant seeking dismissal under this section liable on some basis other than his status as a seller in the stream of commerce, the court shall dismiss without prejudice the claim as to that defendant.

6. An order of dismissal under this section shall be interlocutory until final disposition of plaintiff's claim by settlement or judgment and may be set aside for good cause shown at anytime prior to such disposition.

Mo. Ann. Stat. § 537.762. Several features of the statute are important.

First, under subsection (1), to use this provision a defendant must be liable "based solely on his status as a seller" and can only "be dismissed from a products liability claim."

Second, under subsection (2), a defendant meeting the requirements of subsection (1) can only be dismissed if "total recovery may be had" from another defendant.

Third, motions under this provision are *evidentiary*, requiring an affidavit, discovery, and a "hearing with evidence."

Fourth, dismissal is "interlocutory," and can be set aside *without* revisiting the findings from the hearing, but rather upon "good cause shown." In other words, defendants dismissed under this section are not truly gone from the case.

Each of these statutory provisions confirms that Schnucks was not improperly joined, let alone that there is "no possibility" a Missouri court would find that Harrell stated a claim against it.

## II. The Missouri Innocent Seller Statute Does Not Apply To Ms. Harrell's Negligence Claim.

The innocent seller statute applies only to claims that are *both* products liability claims *and* based solely on the defendants' status as a seller. Here, Ms. Harrell brought a negligence claim and an unjust enrichment claim, and those claims are *neither* "products liability claim[s]," nor "based solely on [Schnucks'] status as a seller."

## A. The Negligence and Unjust Enrichment Claims Are Not Product Liability Claims.

Section 537.762 clearly applies only to "a products liability claim." That term has a precise statutory definition, and the very first paragraph makes clear it does not apply here:

> As used in sections 537.760 to 537.765, the term "products liability claim" means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is **strictly liable** for such damages because:
>
> (1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and
>
> (2) The product was used in a manner reasonably anticipated; and
>
> (3) Either or both of the following:
>
> (a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or
>
> (b) The product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

Mo. Ann. Stat. § 537.760 (emphasis added).

Under this definition, the only "products liability claim[s]" are those based "on a theory that the defendant is strictly liable." Here, Schnucks was not named in

Counts I, IV, VI, VII, or VIII.  *Harrell*.Dkt.3 ¶¶245, 303, 338, 351, 368.  It is named in Count II, which is a strict liability claim.  *Id.* ¶266.  It is also named in Count V, a general negligence count, *id.* ¶317, and Count IX, *id.* ¶382, an unjust enrichment count.  Neither Count V nor Count IX are based on a theory that the defendant is strictly liable, and so the innocent seller statute does not apply by its own terms.

That is why it is common for courts applying this provision to grant a "motion for dismissal on the strict liability count under Mo. Rev. Stat. § 537.762 (1986)" but allow the case to proceed "on the negligence and breach of warranty claims." *Bizzle v. McKesson Corp.*, 961 F.2d 719, 721 (8th Cir. 1992).  At minimum, it is *possible* that a Missouri court could apply the text as-written, and Defendants pointed to no clear and convincing evidence to the contrary.

## B.   Ms. Harrell's Claims Are Not Based Solely on Schnucks' Status as a Seller.

Under Missouri law, "a seller is still liable for its own negligence or other conduct other than its status as a seller in the stream of commerce. Under section 537.762, dismissal is only proper where the defendant's liability is based solely on its status as a seller in the stream of commerce." *Malone v. Schapun, Inc.*, 965 S.W.2d 177, 182 (Mo. Ct. App. 1997), *opinion adopted and reinstated after retransfer* (June 1, 1998).  This case involves negligence and is far different from the typical strict liability case for two key reasons.

First, the complaint alleges that Schnucks knew—and certainly should have known—than ranitidine degrades into NDMA, but did nothing. *E.g. Harrell*.Dkt.3 ¶¶11, 163, 174-78, 321-23, 384. That allegation is well-supported by factual allegations about numerous studies—including studies with pictures of the ranitidine molecule breaking down into NDMA. *E.g.*, *id.* ¶¶ 73-93 (it was widely known that NDMA caused cancer); 110 (Mitch study); 124 (Maura study); 125 (De Flora study); 126 (Le Roux study). Schnucks was a sophisticated specialty pharmacy with trained medical staff. *Id.* ¶¶165-70. "It held itself out as not just a supermarket offering in-store pharmacy services, but as a resource of health and wellness information and services to the communities served by its stores." *Id.* ¶169.

Schnucks knew about the ranitidine studies because it "monitor[ed] medical and scientific knowledge and literature . . . and the regulatory and public health environment." *Id.* ¶172. "Schnucks employs or employed a chief medical officer, and actively audited and researched the safety and efficacy of products offered for sale in its stores. It researched, investigated, and monitored the medical and scientific literature, as well as the regulatory and public health landscape in order to provide health resources and information, and product safety and recall information to its consumers, the general public, and Plaintiff." *Id.* ¶173. It recalled ranitidine after 2019 based on that monitoring, but that was far too late. *Id.* ¶94.

Second, the complaint alleges that ranitidine degrades into *more* NDMA in the presence of heat or humidity, and over time. *Id.* ¶149. Schnucks "knew or . . . should have known" about "the elevated levels of NDMA that occurs when ranitidine-containing products are transported and stored," and that ranitidine is "highly unstable" and "likely to break down." *Id.* ¶321-23. That matters because, unlike a product that is defective when it arrives, sits on shelves unchanged by the retailer, and then is defective when it is purchased and used, ranitidine becomes *increasingly* dangerous while on the shelves, and *much* more dangerous if exposed to heat or humidity (or if left on the shelves too long). *Id.* ¶149. Thus, Schnucks' storage, handling, and distribution materially contributed to Ms. Harrell's harm in a way that is simply not true in cases in which liability is *solely* based on selling the product. Its handling, storage, and transportation was negligent (*i.e.*, it exposed ranitidine to higher heat and humidity than reasonable care would have), making ranitidine more dangerous. *E.g.*, *id.* ¶¶326, 331.

Defendants may wish that the claim here were a garden variety strict liability claim but that simply is not what the complaint pleads. This should be no surprise, since these same Defendants have argued that functionally similar innocent seller statutes apply to in-state retailers in other Zantac cases, and have lost every case except this one. *E.g.*, MDL.Dkt.4924-1 (*Bayer, et al. v. Boehringer Ingelheim Pharmaceuticals, Inc., et al.*, No. 3:21-cv-01084 (S.D. Ill. Sept. 15, 2021));

MDL.Dkt.4924-2 (*Garretson v. Dr. Reddy's Lab'ys, Inc.*, Case No. 3:21-cv-01366 (S.D. Ill. Nov. 16, 2021)).

## C. The District Court's Contrary Holding Was Flawed.

The district court set the bar far too high in denying the motion to remand. It mischaracterized Ms. Harrell's argument, claiming she argued Schnucks was "the functional equivalent of a manufacturing Defendant that designed ranitidine." MDL.Dkt.5166 at 5. Next, it applied Missouri's "more stringent" pleading standard. *Id.* at 6. This was error, since "[n]othing in our precedents concerning fraudulent joinder requires anything more than conclusory allegations or a certain level of factual specificity." *Stillwell*, 663 F.3d at 1334. Even where the state pleading standard requires specificity, the Court's "task is not to gauge the sufficiency of the pleadings" but rather is "more basic," namely to "decide whether the defendants have proven by clear and convincing evidence that no [state] court could find this complaint sufficient." *Henderson*, 454 F.3d at 1284. The district court also erred in ignoring how a Missouri court would react *if* it found the pleading insufficient. This Court has taken note when the state court would "allow the plaintiff to amend the complaint and provide a more definite statement." *Ullah*, 538 F. App'x at 846. Missouri courts would allow that, or, more likely, would not decide the question on the pleadings at all, since the innocent seller statute is evidentiary—requiring an

21

affidavit, discovery, and a hearing at which the "seller can prove" the defense applies. *Gramex Corp. v. Green Supply, Inc.*, 89 S.W.3d 432, 445 (Mo. 2002).

After botching the pleading standard question, the district court invented an argument Defendants never made, and drew inferences in *Defendants'* favor:

> The Plaintiff alleges that Schnuck's chief medical officer would have observed medical studies in the scientific community that examined the potential of ranitidine to form a carcinogen. A reasonable inference from the existence of those scientific studies is that, like the chief medical officer at Schnuck, the FDA *was aware of the very same studies*. Yet, the FDA continued to approve ranitidine for sale. Thus, a reasonable inference is that the chief medical officer could rely upon the FDA's approval of ranitidine.

MDL.Dkt.5166 at 7. This reasoning is riddled with errors—most obviously, it completely ignores the facts pleaded in the complaint about notice, Schnucks' knowledge, and the reality that everyone now knows: ranitidine *does* degrade into NDMA, and *was not* safe at any point. Beyond that factual point, this passage misstates the law.

The district court's premise appears to be that if there were a study suggesting a risk with a drug, the FDA would unilaterally find that study and require a change in the label. But, as the Supreme Court recounted, it was only in "2007" that, "[f]or the first time, [Congress] granted the FDA statutory authority to require a manufacturer to change its drug label based on safety information that becomes available after a drug's initial approval." *Wyeth v. Levine*, 555 U.S. 555, 567 (2009).

Even after 2007, there is no basis whatsoever to infer that the FDA was aware of the studies. That fact is not in the complaint. The FDA has relatively few staff, and they principally review studies and applications submitted by manufacturers (or citizen petitions). There is no basis to believe that the FDA has read *every* study on *every* drug and would have taken action if any of the studies suggested a risk. This is expressly an inference being drawn in Defendants' favor, which is improper even under Rule 12, much less under the stringent test for fraudulent joinder.

The district court also is suggesting that retailers have no duty under state law due to federal regulation, but, again, there is no basis for that inference. Recall that the manufacture, sale, receipt, or delivery of a misbranded drug into interstate commerce—by anyone, including retailers—triggers civil or criminal penalties. *See* 21 U.S.C. §§ 331, 333-334. This is a *strict liability crime* with no *mens rea*. *United States v. Dotterweich*, 320 U.S. 277, 281 (1943). And, of course, Zantac *was* misbranded throughout this time, as the pleading alleges, and as everyone knows after the FDA's recall, since it was not safe, its label was misleading, and its ingredients were not disclosed. *See* 21 U.S.C. § 352(j), (a)(1). The misbranding provision expressly applies to approved drugs. 21 C.F.R. § 314.170.

Next, the district court applied an out-of-circuit, unpublished district court case, which had held that a claim against a grocer for selling tampons "was fraudulently joined under Missouri's innocent seller statute." MDL.Dkt.5166 at 8

(citing *Wichmann v. Proctor & Gamble Manufacturing Company*, No. 4:06-cv-1457, 2006 WL 3626904 (E.D. Mo. Dec. 11, 2006)). *Wichmann* lacks every feature that makes this case easy. The product was still on the market and approved by the FDA, unlike ranitidine. There were no allegations that the defendant knew or should have known of the defects in the tampons (whether through studies or otherwise). The theory was for failure-to-warn, not negligent storage and transportation. And the court in *Wichmann* simply never considered the statutory definition of "product liability claim."

### III. Defendants Failed To Prove Schnucks Was Immune.

Under Missouri law, the dismissal follows only if the defendant files an affidavit (which did not happen), allows 60 days of discovery (which did not happen), and proves at a hearing its entitlement to the defense—which, again, did not happen. Even then, dismissal is "interlocutory," meaning the defendant is not truly gone. Each of those reasons precludes a finding of fraudulent joinder.

First, under subsection (2), dismissal occurs only if the putative innocent "seller can prove that 'another defendant, including the manufacturer,' is in the lawsuit from whom plaintiff can obtain 'total recovery.'" *Gramex Corp.*, 89 S.W.3d at 445 (quoting Mo. Stat. Ann. § 537.62). That is supposed to be done through an affidavit, discovery, and a hearing. Defendants *could have* procured an affidavit from Schnucks denying the allegations in the complaint about its negligence, and

*could have* submitted affidavits themselves, admitting that they were the manufacturer of the ranitidine Ms. Harrell consumed, and demonstrating that they are able to pay her full damages. But none of that happened.

Here, Defendants submitted no evidence that they could pay full compensation. In *Thompson v. R.J. Reynolds Tobacco Co.*, the district court remanded because "Defendants offered no evidence whatsoever that 'total recovery' could be had from Defendant R.J. Reynolds." No. 4:20-cv-980, 2020 WL 5594072, at *3 (E.D. Mo. Sept. 18, 2020); *see also Just. v. Rural King Holdings, LLP*, No. 4:22-cv-00050, 2022 WL 2904141, at *3 (E.D. Mo. July 22, 2022) ("The remaining parties' ability to satisfy a verdict must be established through specific evidence."). Later cases before the same court were not remanded *because* R.J. Reynolds submitted evidence. *Anderson v. R.J. Reynolds Tobacco Co.*, 549 F. Supp. 3d 979, 984 (E.D. Mo. 2021); *Thomas v. Brown & Williamson Tobacco Corp.*, No. 06-cv-0223, 2006 WL 1194873, at *3 (W.D. Mo. Apr. 28, 2006) (relying on affidavits).

Worse, Defendants here did not even acknowledge they *were* the manufacturers. That is fatal under Missouri law. "Where it is unclear who the manufacturer of the product-at-issue was, or where it is otherwise unclear that a total recovery can be had against the parties remaining in suit, it is error to apply the innocent seller statute." *Davis v. Dunham's Athleisure Corp.*, 362 F. Supp. 3d 651,

659 (E.D. Mo. 2019). It is clear why Defendants filed no affidavits confirming this—counsel has extensive experience litigating Zantac cases, and Brand Defendants consistently challenge product identification. Brand Defendants scour medical and pharmacy records and ask detailed questions during depositions to nail down precisely what the pill bottle looked like. Sometimes, Brand Defendants are trying to show that the plaintiff consumed *generic* ranitidine, for which recovery is more difficult, and likely would not come from any Brand Defendant. Thus, it would be highly valuable for Ms. Harrell for the Brand Defendants to submit an affidavit affirming that they manufactured the product. Otherwise, if Brand Defendants later can prove she consumed generic ranitidine, they may be able to escape the case, leaving Ms. Harrell with no recovery—even though product identification would be no problem with respect to Schnucks, which sold both generic ranitidine and Zantac. In *Wichmann*, which the district court relied upon extensively, Defendant Tambrands confirmed "it was the manufacture [sic] of . . . the product in issue in this case." 2006 WL 3626904, at *1 n.2.

Last, but still important, under Missouri law, dismissal would be "interlocutory," allowing reinstatement for good cause. That would mean that if a later development in the case—a product identification defense, an unforeseen bankruptcy, etc.—threatened Ms. Harrell's recovery, Schnucks would be reinstated. That feature means Schnucks would never truly be out of the case in state court. In

federal court, of course, it could *not* be reinstated for good cause, since that would destroy diversity jurisdiction.

## CONCLUSION

Missouri law provides a narrow defense to strict liability claims if certain elements are demonstrated with evidence. The district court allowed Defendants to invoke that defense to *non*-strict liability claims, *without* any evidence. Worse, it allowed that distortion of Missouri law under a standard in which *Defendants* had the burden of proving by clear and convincing evidence that Ms. Harrell's claims against Schnucks had no chance in Missouri state court. That error should be vacated, with instructions to remand the case to the Circuit Court of the Twenty-Second Judicial Circuit in St. Louis Missouri.

Dated:  April 10, 2024                          Respectfully submitted,

                                                                */s/ Ashley Keller*
                                                                Ashley Keller
                                                                KELLER POSTMAN LLC
                                                                150 N. Riverside Plaza, Suite 4100
                                                                Chicago, IL 60606
                                                                Tel: (312) 741-5222

                                                                Noah Heinz
                                                                Keller Postman LLC
                                                                1101 Connecticut Ave., NW
                                                                Suite 1100
                                                                Washington, DC 20036

                                                                *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) , because it contains 6,328 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Dated: April 10, 2024

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiff-Appellant*

**CERTIFICATE OF SERVICE**

On April 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

<div style="margin-left:40%">

*/s/ Ashley Keller*
Ashley Keller
*Counsel for Plaintiff-Appellant*

</div>